UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Angela Edwards, | ) | C/A No. 5:15-1197-BHH-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| Carolyn W. Colvin, Acting Commissioner | ) | |
| of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act"). The issues before the court are whether the decision is supported by substantial evidence, and whether the Commissioner's decision contains an error of law. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.   Relevant Background

A.   Procedural History

Plaintiff applied for DIB and SSI on May 12, 2011,[1] Tr. 205-15, pursuant to Titles II and XVI of the Act, 42 U.S.C. §§ 401-403, and 380-83, *et seq.*, alleging a disability onset date of August 1, 2010. Her applications were denied in initial and reconsidered determinations. Tr. 83-85, 113-15. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 136,

---

[1] Although the applications are dated May 17, 2011, Plaintiff's protective filing date is May 12, 2011. *See* tr. 225.

which was held on August 21, 2013, Tr. 23-65. In a decision dated October 8, 2013, the ALJ found that Plaintiff was not disabled within the meaning of the Act. Tr. 11-22. Plaintiff requested review of the decision, Tr. 9-10, which was denied by the Appeals Council on January 12, 2015, Tr. 1-3, making the ALJ's decision the final decision of Defendant (the Commissioner) for purposes of judicial review. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on March 13, 2015. ECF No. 1.

### B. Plaintiff's Background

Plaintiff, born in October 1974, was 35 years old on August 1, 2010, her alleged onset date. Tr. 224. Plaintiff completed one year of college. Tr. 218. Plaintiff has past relevant work ("PRW") as an administrative assistant and substitute teacher. *Id.* Plaintiff stopped working as a substitute teacher on December 21, 2009, because the job ended but she alleged that on August 1, 2010, her medical condition of arthritis became severe enough to keep her from working. Tr. 217.

### C. The Administrative Proceedings

#### 1. Plaintiff's Hearing Testimony

At Plaintiff's August 21, 2013 hearing, in response to questions from the ALJ, she stated that she completed two years of technical school and obtained a degree in computer technology. Tr. 27. Plaintiff testified that she lived alone with her four-year-old son but her mother and aunt assisted her with caring for her child. *Id.* She testified that her mother and aunt bathed her son, cooked their meals, ironed their clothes, and made sure that her son got on the bus for pre-school. Tr. 28. Plaintiff testified that she had a driver's license but did not drive and had not driven since she became sick in 2010. *Id.* Plaintiff testified that in August 2010 she "got out of bed one night

and [she] couldn't walk and [she] had to crawl to get to the restroom and so [she] called [her] mom and told her about it and she took [Plaintiff] to the hospital in Hampton." Tr. 29.

In response to questions from her counsel Plaintiff testified that in 2009 she was working for the Department of Disabilities and Special Needs but had to stop working due to complications with her pregnancy. Tr. 30. Plaintiff stated that after she stopped working there, she was self-employed as a babysitter and in June 2010 she obtained registration from the Department of Social Services to be a daycare provider. Tr. 31. Plaintiff confirmed that before she could get the business started she had the issue with the arthritis flare in August. Tr. 31-32. Plaintiff stated that at that time she was treated by doctors at Hampton Comprehensive Health Services, but later was seen by Dr. Vega at Palmetto Primary Care and by a rheumatologist from Lexington Rheumatology. Tr. 32-33. Plaintiff stated that she was placed on multiple medications—initially she was taking Plaquenil but she could not tolerate that medication. Tr. 33. Plaintiff testified that while on the Plaquenil she "lost a whole lot of weight" and she "had a lot of rashes." Tr. 34. Plaintiff stated that she had problems with rashes from other medications including Prednisone, Mobic, and Naproxen. Tr. 34-35. Plaintiff testified that in addition to the rash she experienced constant itching, even while sleeping. Tr. 35. Plaintiff stated that she was placed on Methotrexate which seemed to help for a while, but she had to stop taking it due to reactions which caused lesions on her hands. Tr. 36. Plaintiff was also given injections of Dethamederol for pain which helped but lasted for only "a month or so." Tr. 37. Plaintiff testified that she began having reactions to the injections and had to be taken off that medication. Tr. 38. Plaintiff testified that she is "always in pain and now [she is] always tired and [she] feel[s] weak and sometimes [she] feel[s] like [she is] just going to pass out. Sometimes [she] could be walking and [she] get[s] so weak, like [she is] going to pass out." *Id.* Plaintiff testified

that she takes two pills for anemia every day but nothing has helped with her fatigue problem. *Id.* Plaintiff stated that she did not know if the fatigue was due solely to the anemia or was partly due to her medications. Tr. 38-39. Plaintiff testified that at her last appointment with the rheumatologist in May 2013 she was doing so well that the doctor scheduled her follow-up appointment in six months instead of the usual three months. However, within one or two months she called back because she started having severe pain but was told she could not be seen until her scheduled appointment in November. Tr. 39. When asked how the pain and fatigue has affected her on a daily basis Plaintiff testified that for the last three years she has become dependent on her family for care of her and her son. Tr. 40. Plaintiff's counsel noted that Plaintiff's family lives right beside her. *Id.* Plaintiff testified that she can no longer do her own hair, and her hair has fallen out—which she attributes to the medications and the sickness. Tr. 41. Plaintiff stated she has problems of pain and swelling in her wrists and hands and sometimes has problems trying to open bottles. Tr. 41-42. Plaintiff testified that her joint pain is not in one spot, but that she gets "pain all over. Sometimes pain come[s] in [her] neck. It moves from [her] neck to [her] shoulder. Sometimes it [will] be three spots [at] one time. It gets in [her] knees, it gets in [her] leg, [her] feet. It comes all over. [She] never know[s] where it's going to come." Tr. 42. Plaintiff testified that she since she became sick she has memory loss and unless she has someone to accompany her or drive her to appointments she has her mother write down information that she needs to remember. Tr. 43. Plaintiff stated that she now wears slip-on shoes because of problems with bending or tying shoe laces. Tr. 44. Plaintiff testified that she is "so tired and sleepy all the time. [She] sleep[s] most of the day." *Id.* Plaintiff stated that her son is in Head Start preschool five days a week and sometimes she can get him ready and on the bus but other days she has to call her mother for help. Tr. 44-45. Plaintiff testified that while he is at

4

school she is at her grandmother's house all day and alternates between lying on the couch and sitting in the recliner. Tr. 45. Plaintiff stated that with household chores she "can start a project" but within minutes of starting she would have to sit down. Tr. 46.

### 2. Vocational Expert ("VE") Testimony

VE Tenetta Watson Coleman testified at Plaintiff's administrative hearing. Before describing Plaintiff's PRW she asked Plaintiff to clarify what was involved in obtaining her home childcare certification. Tr. 47. Plaintiff testified that she went to a class and was told what procedures she needed to make her home suitable for childcare. Tr. 48.

The ALJ asked Plaintiff about her prior work history and Plaintiff stated that when she was babysitting she did that fulltime but she could not recall how many months she worked in 2009. Tr. 49-50. Plaintiff testified that she worked fulltime for the Disabilities Board in 2008 and in January of 2009. Tr. 50. Plaintiff also testified that she previously worked fulltime for the South Carolina School District as "a substitute teacher and they promoted [her] to administrative assistant, secretary." Tr. 51-52. The ALJ also noted self-employment earnings in 2001, which Plaintiff's counsel thought might also have been from babysitting; work at fast food restaurants that were not substantial gainful activity ("SGA"); and employment with Customer Communications Center in 2009. Tr. 52-53. Plaintiff testified that she did "inbound telemarketing" fulltime for Customer Communications Center but she could not remember what months she worked for that company. Tr. 53. Plaintiff confirmed that she also worked for Renal Advantage in 2006 but could not recall how long she worked for that employer. Tr. 54. The ALJ also noted Plaintiff's prior work for Care Core that was not SGA and for Value Financial Services. Tr. 55. Plaintiff testified that Value Financial Services was a pawn shop and she was employed as a customer service person. Tr. 55. Plaintiff testified that her duties included running

the cash register, demonstrating items, putting items on layaway, and a little sweeping and cleaning. Tr. 55-56. Plaintiff stated that she never lifted anything heavy, was able to sit or stand as needed, and worked fulltime—however she could not remember the number of months she worked. Tr. 56.

The VE described Plaintiff's PRW as follows:

> Substitute teacher, SVP of 6, skilled, strength level light, DOT 099.327-010. Administrative assistant, SVP of 3, semi skilled . . . . Strength level light, DOT 209.562-010. Patient care tech, SVP of 6, skilled, strength level light, DOT 078.362-014. Telemarketer, SVP of 3, semi skilled, strength level sedentary, DOT 299.357-014. Aide, SVP of 6, skilled, strength level medium, DOT 355.377-018. Babysitter. SVP of 3, semi skilled, strength level medium, DOT 301.677-010. Retail sales clerk, SVP of 3, semi skilled, strength level light, DOT 279.357-054.

Tr. 57. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and past work experience who could "perform the demands of sedentary work as defined in the regulations and the Dictionary of Occupational Titles with pushing and pulling, 10 pounds occasionally and five pounds frequently." *Id.* The ALJ further proposed that the individual could "occasionally climb ramps and stairs, stoop and kneel, but never climb ladders, ropes, and scaffolds, balance for safety on dangerous surfaces, crouch, or crawl. The individual can frequently reach, handle, and finger bilaterally. The individual should avoid exposure to hazards, such as dangerous moving machinery and unprotected heights." Tr. 58. The ALJ asked the VE if such a person could do any of Plaintiff's past work. *Id.* The VE responded that the individual could perform Plaintiff's job as a telemarketer both as generally performed and as described by Plaintiff in her work history form. *Id.* The ALJ asked if Plaintiff would have acquired any skills from her certification for home childcare that would allow her to enter into other work within the defined sedentary residual functional capacity ("RFC") and the VE responded in the negative. *Id.* The ALJ asked the VE if there would be any readily transferable skills from Plaintiff's past

skilled work to the sedentary RFC in the hypothetical. Tr. 58-59. The VE responded affirmatively and identified the skills of communication, customer service, reading and writing. Specifically, familiarity "with the knowledge and products in sales, being able to locate and understand written information, and as far as writing, being able to document descriptions, receipts, and being able to record messages." Tr. 59. However, when asked about readily transferrable jobs at the semi-skilled level, the VE changed her response to no jobs available. Tr. 60. The VE identified the following unskilled jobs available at the sedentary level:

> Surveillance system monitor, SVP of 2, unskilled, sedentary, South Carolina 550, national economy 74,470, DOT 379.367-010. Telephone quotation clerk, SVP of 2, unskilled, sedentary, South Carolina 15,900, national economy 973,800, DOT 237.367-046. And order clerk, food and beverage, SVP of 2, unskilled, sedentary, South Carolina 1,790, national economy 215,390. DOT 209.567-014.

Tr. 60-61. The ALJ asked the VE if the hypothetical individual also needed a sit/stand option at their work station every 30 minutes to an hour could they do the past work as telemarketer and the VE responded affirmatively. Tr. 61. The ALJ asked Plaintiff if she could stand when needed when she worked as a telemarketer and the Plaintiff stated she could not. *Id.* Plaintiff also testified she could no longer do the telemarketing work because she is very nearsighted and the computer hurts her eyes. *Id.* The VE confirmed that the hypothetical individual could not do the job as Plaintiff performed it. Tr. 62. The VE testified that, based on her professional experience and observation, the other unskilled jobs could be done with the sit/stand option. Tr. 62. The ALJ asked the VE if the hypothetical individuals could do any jobs if "they could not maintain persistence and pace on their work task for at least two hours at a time due to interruptions from their pain" and the VE testified that "would eliminate all jobs." *Id.*

Plaintiff's counsel asked the VE if an individual would be able to maintain SGA if the individual "because of medical and health problems were to be absent from work entirely at least three to four days per month" and the VE responded negatively.

In a closing statement Plaintiff's counsel pointed out that the treatment records from Lexington Rheumatology indicated the doctor could not determine the cause of Plaintiff's problems with pain and inflammation and did not think it all due to rheumatoid arthritis but also considered cirrhosis or sarcoidosis, and his records indicated consistent problems with pain and swelling. Tr. 63-64. Plaintiff's counsel also noted Plaintiff's testimony regarding a decrease in pain in the early summer, but a July 10 medical record indicated that Plaintiff experienced "a flare that had been going on for about two weeks—which would mark the end of that improvement period that she had." Tr. 64. Plaintiff's counsel stated that theoretically Plaintiff could not maintain employment "either because she'd be absent entirely too often or she would be off task entirely more than an acceptable amount." Tr. 65.

## II. Discussion

### A. The ALJ's Findings

In her October 8, 2013, decision, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.  The claimant has not engaged in substantial gainful activity since August 1, 2010, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: inflammatory arthritis; anemia; and idiopathic urticaria[2] (20 CFR 404.1520(c) and 416.920(c)).

---

[2] Urticaria is a term used by the dermatologists and physicians for the common skin disease, hives. Idiopathic Urticaria has the symptoms of rashes, extreme and constant itching without a

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with pushing and pulling 10 pounds occasionally and 5 pounds frequently; occasionally climbing ramps and stairs, stooping and kneeling, but never climbing ladders, ropes or scaffolds, balancing for safety on dangerous surfaces, crouching or crawling; frequently reaching, handling, and fingering bilaterally; and avoiding exposure to hazards such as unprotected heights and dangerous moving machinery. The claimant should have a sit/stand option at the work station every 30 minutes to one hour.

6.      The claimant is able to perform past work as a telemarketer (20 CFR 404.1565 and 416.965).

7.      The claimant was born on October 20, 1974, and was 35 years old, which is defined as a younger individual age 45-49 [sic], on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy

---

properly known cause. *See* http://www.chronic-urticaria.org/idiopathic-urticaria-description-of-chronic-idiopathic-urticaria (last visited Apr. 15, 2016).

that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 16-22.

### B.  Legal Framework

#### 1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW; and (5)

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20

whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520, § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) and § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

---

C.F.R. § 404.1520(a)(4)(iii); § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party."  42 U.S.C. § 405(g).  The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that her conclusion is rational.  *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.  Analysis

Plaintiff asserts that: (1) the ALJ erred in determining her impairments did not meet or equal Listing 14.09; and (2) the ALJ failed to provide adequate reasons for her credibility

determination. Pl.'s Br. 2, ECF No. 13. The Commissioner argues that Plaintiff's contentions are without merit. Def.'s Br. 11, ECF No. 14.

1.     Listing 14.09

Plaintiff alleges that at Step Three in the sequential evaluation process the ALJ failed to properly consider Listing 14.09 when she determined that Plaintiff's impairments did not meet or equal a listing. Pl.'s Br. 20. Plaintiff asserts she "could meet or equal 14A2. There is no question that [Plaintiff] has persistent inflammation in her upper extremities." *Id.* at 23. Plaintiff also asserts the record evidence supports "an inability to perform fine and gross movements effectively" as defined in the listing. *Id.* The Commissioner argues that Plaintiff did not meet the first prong of the listing—an inability to walk, and the "record supports the ALJ's finding that Plaintiff did not demonstrate an inability to use both of her hands effectively—the second prong of the Listing."[4] Def.'s Br. 12.

The ALJ determined one of Plaintiff's severe impairments to be inflammatory arthritis. Tr. 16. Inflammatory arthritis is described in the listings under section 14.00 as follows:

> Clinically inflammation of major peripheral joints may be the dominant manifestation causing difficulties with ambulation or fine and gross movements; there may be joint pain, swelling, and tenderness. The arthritis may affect other joints, or cause less limitation in ambulation or the performance of fine and gross movements. However, in combination with extra-articular features, including constitutional symptoms or signs (severe fatigue, fever, malaise, involuntary weight loss), inflammatory arthritis may result in an extreme limitation.

To meet Listing 14.09A a claimant must have inflammatory arthritis along with:

> A. Persistent inflammation or persistent deformity of:

> 1. One or more major peripheral weight-bearing joints resulting in the inability to ambulate effectively (as defined in 14.00C6); or

---

[4] As noted by Plaintiff in her Reply Brief, Listing 14.09 does not require that a claimant have the inability to ambulate effectively *and* the inability to perform fine and gross movements effectively.  Instead the Listing provides that a claimant must meet one *or* the other criteria. Pl.'s Reply 2-3, ECF No. 15.

> 2. One or more major peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements effectively (as defined in 14.00C7).

20 C.F.R. pt. 404, subpt. P, app. 1, § 14.09(A). Listing 14.00C7 provides that the inability to perform fine and gross movements effectively has the same meaning as in Listing 1.00B2c. That Listing provides:

> Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00(B)(2)(c).

Plaintiff argues that there is "record evidence" that she has an inability to perform fine and gross movements effectively. Pl.'s Br. 23. Plaintiff cites to Dr. Steinert's report that noted Plaintiff had difficulty with the buttons on her dress and needed the doctor's help. *Id.* (citing Tr. 513). She also cites to her own allegations in her disability reports where she stated that she requires assistance caring for herself and her son. *Id.* (citing Tr. 235, 243, 248). The Commissioner contends that "the objective evidence does not support the degree of difficulty with using her hands that Plaintiff presented to Dr. Steinert or her unsupported statements regarding her limitations on her disability report." Def.'s Br. 13.

Dr. Steinert completed an orthopedic examination of Plaintiff on June 11, 2012. Tr. 510-13. As part of the examination she completed a Range of Motion Chart for Orthopedic Exam. Tr. 510-11. Dr. Steinert did not indicate any abnormal limitations in Plaintiff's hands. Tr. 511. In her

physical examination of Plaintiff she noted the following with regard to Plaintiff's upper extremities:

> There is swelling and tenderness to palpation in her finger joints and the tips of her fingers are cold. She has tenderness to palpation of her left shoulder and left wrist also. There are no sensory or motor deficits in any extremity. There is no muscle atrophy. Grip strength is decreased and equal bilaterally (3/5) due to the pain in her finger joints. There are decreased fine motor and gross motor skills in both hands due to the pain in her joints. She had difficulty with the buttons on her dress and I actually had to help her. Deep tendon reflexes are equal and normal in all extremities. Peripheral pulses are normal and equal in all extremities.

Tr. 513. In the section of the report labeled "Limitations of ADL's and Work Activity" the only notation Dr. Steinert made was: "She appears to have a lot of pain in her joints and her finger joints are swollen. She is tender to palpation of several joints." *Id.* The undersigned notes that although Dr. Steinert reported Plaintiff's difficulty with the buttons on her dress, Dr. Steinert did not opine that Plaintiff had an inability to perform fine and gross movements—only that she had decreased fine and gross motor skills.

Generally, it is the responsibility of the ALJ to decide whether a listing is met or equaled by a claimant's impairments. *See* SSR 96-6p, 1996 WL 374180 at *3. In order to determine whether a medical impairment equals a listing, the ALJ is bound to "consider all evidence in [claimant's] case record about [the] impairment(s) and its effects on [claimant] that is relevant to this finding. . . . [The ALJ] also consider[s] the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. §§ 404.1526(c), 416.926(c). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. at 530 (emphasis in original). A claimant "bears the burden of production and proof" in order to show his condition meets a listing. *Pass v. Chater,* 65 F.3d 1200, 1203 (4th Cir. 1995).

Here, the ALJ stated that she considered Listing 14.09 and appropriately set out the requirements for the Listing but determined Plaintiff did not meet the Listing "due to mild to moderate symptoms that responded well to medication and failed to result in the required Listing level complications set forth above." Tr. 17-18. To support her determination the ALJ cited to a December 2011 treatment record of rheumatologist Bruce Goeckeritz, M.D. that "revealed no signs of active synovitis in the small joints of her hands and wrists." *Id.* The ALJ noted the June 2012 consultative examination of Harriet Steinert, M.D. that showed Plaintiff had "some swelling and tenderness in her finger joints and slightly limited range of motion in her shoulders, left wrist, and knees" and an x-ray that revealed "minimal to mild interphalangeal joint arthritis in her hands." *Id.* The ALJ further noted that by October 2012 Plaintiff "indicated improvement in her hands, and her exam revealed minimal swelling her joints." *Id.* Citing to Plaintiff's May 2013 visit to Dr. Goeckeritz, the ALJ noted that Plaintiff reported "that she was doing well using Ibuprofen alone, and she had no inflammation upon examination." *Id.* The ALJ recognized that subsequent to this visit Plaintiff experienced a flare, but noted that "she recovered quickly and remained off of prescription medications."[5] *Id.*

Although Plaintiff may be able to point to selective evidence in support of a finding that she meets Listing 14.09, she has not shown the ALJ's decision is not supported by substantial evidence. *See Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990) (holding that it is the ALJ's responsibility, not the court's, to determine the weight of evidence and resolve conflicts of evidence); *see also Jackson v. Astrue,* 2010 WL 500449, at *10 (D.S.C. Feb. 5, 2010) ("[A]n ALJ is not required to provide a written evaluation of every piece of evidence, but need only 'minimally articulate' his reasoning so as to 'make a bridge' between the evidence and his

---

[5] As discussed in the next section of this Report, the ALJ misstated that Plaintiff was not taking prescription medication.

conclusions.") (citations omitted). Because the ALJ considered pertinent evidence in analyzing whether Plaintiff met Listing 14.09, the undersigned does not find that the ALJ erred in her explanation for her listing determination.

### 2.    ALJ's Credibility Analysis

Plaintiff alleges that the ALJ failed to provide adequate reasons for her credibility determination. Pl.'s Br. 28. The Commissioner argues the ALJ complied with the regulations in evaluating Plaintiff's credibility. Def.'s Br. 14.

In assessing a claimant's credibility, the ALJ must follow a two-step process. Before considering a plaintiff's subjective complaints the ALJ must find there is an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. Only then is the ALJ to move to the second step: consideration of the record as a whole, including both objective and subjective evidence, to assess the claimant's credibility regarding the severity of her subjective complaints. *See* SSR 96-7p, 1996 WL 374186; *see also* 20 C.F.R. §§ 404.1529, 416.929; *Craig v. Chater*, 76 F.3d 585, 591-96 (4th Cir. 1996). The requirement of considering a claimant's subjective complaints does not mean the Commissioner must accept those complaints on their face. The ALJ may consider the claimant's credibility in light of her testimony and the record as a whole. This part of the ALJ's analysis requires the ALJ to weigh Plaintiff's complaints against "all the available evidence, including [Plaintiff's] medical history, medical signs, and laboratory findings," and "any other evidence related to the severity of the impairment, such as evidence of [Plaintiff's] daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it." *Craig*, 76 F.3d at 595 (internal quotation marks and citations omitted).

If the ALJ rejects a claimant's testimony about a claimant's pain or physical condition, she must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989) (quoting *Smith v. Schweiker*, 719 F.2d 723, 725 n.2 (4th Cir. 1984)). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.

Here, discussing Plaintiff's credibility the ALJ provided the following analysis:

The claimant testified and reported that she suffers from joint pain, fatigue, and dizziness that prevent her from working. After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision. Specifically, the undersigned finds that the claimant's allegations of pain are partially credible, as her most recent treatment notes reveal that aside from experiencing one subsequent flare in May 2013, she reported being pain free, off of prescription medication, and satisfied with the use of over-the-counter Ibuprofen. (Exhibit 29F).

Tr. 20. The ALJ further noted that Plaintiff's "condition has resulted in few limitations upon examination and is generally under control with the use of non-prescription medications" and "she has been doing well with little pain with Ibuprofen and no inflammation upon examination." *Id.*

Plaintiff argues the ALJ's decision was based on a misstatement of fact because the Ibuprofen she was using was not over-the-counter ("OTC") but was a prescription-strength medication. Pl.'s Br. 29. Plaintiff also asserts the ALJ failed to consider Plaintiff's medication side effects/allergies which accounted for the reason Plaintiff was not taking additional

medication. *Id.* The Commissioner asserts this "error is harmless because the regulations concerning the evaluation of subjective complaints do not distinguish between prescribed and [OTC] medication" and the "relevant consideration is whether the prescribed or [OTC] medication is effective." Def.'s Br. 14-15. The Commissioner argues Plaintiff has "failed to demonstrate how she was harmed by the ALJ's inadvertent description of the Ibuprofen that she took as an [OTC] medication." *Id.* at 15. In Reply, Plaintiff notes that while the regulations do not differentiate between prescription and over-the-counter medications, the regulations indicate "the ALJ should consider the '*type, dosage*, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms.'" Pl.'s Reply Br. 8 (emphasis in original) (citing 20 C.F.R. § 404.1529(c)(3)(iv)).

While the ALJ seems to imply that because Plaintiff took OTC medication her pain could be managed more easily, her reliance on this apparent inference does not provide a basis for remand. Whether her medications were prescribed or OTC, or if side effects prevented her from taking other types of medication, as the ALJ noted, in May 2013 Plaintiff reported she was "pain free." Tr. 20. The ALJ further discussed Plaintiff's medical records and examinations that revealed few limitations. *Id.* The undersigned finds that despite the ALJ's misstatement about the type of medication Plaintiff was using, the ALJ's credibility analysis is supported by substantial evidence and was sufficiently specific. The ALJ discussed the two-part test for evaluating pain and analyzed the entire case record. Tr. 19-20. As a result the ALJ determined that "the combined effects of the claimant's impairments result in some limitations, but are consistent with her ability to perform sedentary work . . . ." *Id.* In addition to the opinions of Plaintiff's treating and evaluating physicians the ALJ considered the opinions of state agency medical consultants

who determined Plaintiff could perform work at the light exertional level.[6] However, because the ALJ found that "additional medical evidence received at the hearing level show[ed] greater limitations" she did not give those opinions weight. Tr. 20. Instead she further limited Plaintiff's RFC.

Even if the court were to agree with Plaintiff on her challenges to the ALJ's analysis, the undersigned finds that Plaintiff has failed to demonstrate that the ALJ's credibility analysis as a whole is unsupported by substantial evidence or controlled by an error of law. *See Hines v. Barnhart*, 453 F.3d 559, 565 n.3 (4th Cir. 2006) (noting that a claimant's allegations "need not be accepted to the extent that they are inconsistent with available evidence"); *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (finding that the ALJ may properly consider inconsistencies between a plaintiff's testimony and the other evidence of record in evaluating the credibility of the plaintiff's subjective complaints); *Blalock v. Richardson*, 483 F.2d at 775 (indicating that even if the court disagrees with the Commissioner's decision, the court must uphold it if it is supported by substantial evidence). Here, the ALJ pointed to evidence in the record to support her conclusion that Plaintiff's statements were not entirely credible—including Plaintiff's self-report to her doctor that she was pain free. Therefore, she satisfied her duty under the applicable regulations and law. The undersigned finds the ALJ's review of the record as a whole, including her articulated reasons for discounting Plaintiff's claims, supports a finding that the Commissioner's decision should be affirmed. *See Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000) (noting ALJ may discount a claimant's complaints if inconsistencies are apparent in the evidence as a whole).

---

[6] Medical consultant Joseph Gonzalez, M.D. provided an opinion on August 11, 2011, and Jean Smolka, M.D., provided an opinion on June 14, 2012. Tr. 66-82, 87-112.

III. Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the undersigned finds that the Commissioner performed an adequate review of the record evidence and that the decision is supported by substantial evidence.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under the Act, it is recommended that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

April 15, 2016                                           Kaymani D. West
Florence, South Carolina                                United States Magistrate Judge


**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**